IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALLISON SKIDMORE,<br><br>    Plaintiff,<br><br>    v.<br><br>VIRTUA HEALTH INC.,<br><br>    Defendant. | CIVIL NO. 11-503(NLH)(AMD)<br><br>**OPINION** |

**APPEARANCES:**

PAUL CALVIN LANTIS
ARI R. KARPF
KARPF, KARPF & CERUTTI, P.C.
3331 STREET ROAD, SUITE 128
TWO GREENWOOD SQUARE
BENSALEM, PA 19020

    On behalf of plaintiff

ELIZABETH D. TEMPIO CLEMENT
KRISTINE GRADY DEREWICZ
LITTLER MENDELSON PC
THREE PARKWAY
1601 CHERRY STREET
SUITE 1400
PHILADELPHIA, PA 19102

    On behalf of defendant

**HILLMAN**, District Judge

    This matter has come before the Court on defendant's motion for summary judgment on plaintiff's claims that defendant violated her rights when she was terminated from employment because of her disability.  For the reasons set forth below, defendant's motion will be granted in part and denied in part.

**BACKGROUND**

Plaintiff, Allison Skidmore, is a registered nurse who had worked for defendant Virtua Health Inc. since 1981 in various capacities. In 2003, plaintiff began working as an RN at Summit Surgical Center, and by June 2008, she was working part-time, two or three shifts a week. Plaintiff's job duties included assessing, diagnosing, planning, implementing, and evaluating care for patients, who included adults and children. Her direct supervisors were Edie Galasso, Assistant Manager of Peri-Op, and Diane Fahey, Director of Nursing.

Plaintiff was a skilled and well-liked nurse who was popular with patients and staff. Unfortunately, plaintiff suffers from alcoholism, anxiety, depression, and has a volatile relationship with her husband. Throughout the time they worked together, plaintiff confided in Galasso about these problems, both at work and in personal phone calls outside of work. Galasso was very supportive of plaintiff, and she often suggested that plaintiff seek help through Virtua's employee assistance program. Plaintiff, however, never sought assistance through that program.

As of February 2009, plaintiff had received several written warnings, in accordance with defendant's progressive discipline policy, regarding plaintiff's mishandling of drugs and specimens. Plaintiff's attendance had also become an issue through the first half of 2009. By the end of June 2009, Galasso noted on

plaintiff's performance evaluation that plaintiff "has shown considerable improvement in attendance and is consistently more focused, [decreased] errors and irratic (sic) behavior." In mid-August 2009, however, Galasso issued plaintiff a written "performance appraisal action plan," which was to "identify the behavior . . . that must be improved . . . to meet position expectations," regarding her attendance problems, her erratic and inappropriate behavior, and the proper labeling of specimens.

On December 3, 2009, on her way to work, plaintiff struck a neighbor's car as she backed out of her driveway. Shaken and extremely upset, plaintiff called to say she would not be at work. Galasso learned that plaintiff was going to be absent, and she called plaintiff to inquire about whether she could come into work because two other nurses had called out as well, the unit was short-staffed, and it would not "look good" if plaintiff did not come to work due to her prior attendance issues. Plaintiff told Galasso she would come in if she could. Plaintiff never came to work that day because she believed it was not safe for her to work in her extremely anxious state.

According to defendant, Galasso had been under the impression that plaintiff was going to report to work that day. When she did not show up, Galasso informed Fahey about what had happened, and they consulted with Tracy Sola, the human resources manager. They calculated that plaintiff's December 3, 2009 absence brought the

total number of call-outs for that year to six, along with 31 days that plaintiff was late.[1] According to defendant, it was decided that plaintiff's employment was to be terminated as the next step under the progressive discipline policy. Fahey requested that plaintiff be granted the option of resigning in lieu of termination so that she could collect payment for her accrued, unused paid time off benefits. Sola approved that request.

When plaintiff arrived for work on December 7, 2009 for her next scheduled shift, Galasso and Fahey told plaintiff that she was being terminated for her attendance violations. Plaintiff became hysterical, started to cry, and said that her husband was "going to kill" her. The remainder of the meeting was very emotional, with Galasso and Fahey hugging and sobbing with plaintiff, as they discussed plaintiff's personal problems and alcohol dependency issues. At the end of the meeting, plaintiff signed the prepared

---

[1] Plaintiff contests defendant's description and calculation of her attendance. She points out that on 15 of the 31 days she was late for work, she was late less than seven minutes, with many instances being one to two minutes late. Plaintiff contends that defendant had a policy that an employee was not considered "late" until she clocked in more than seven minutes past her start time. She also contends that she only had five absences because two of the absences counted as one "occurrence." Additionally, plaintiff argues that the attendance policy was flexible, many employees were often late, and in her prior 30 years of employment, she had never been disciplined about a problem with lateness. Defendant, however, emphasizes the imperative to have its nurses at their work stations on time, and disputes plaintiff's belief about the seven minute grace period. As discussed below, the dispute over plaintiff's attendance will be for a jury to consider in the context of assessing whether defendant terminated plaintiff because of her disability.

resignation letter, and left the facility.  The next day, on the advice of her union, she rescinded her resignation.

In her complaint, plaintiff claims that her termination was not actually motivated by her attendance issues, but because of her disability--alcoholism.  Plaintiff argues that several pieces of direct evidence prove her claims:

(1) plaintiffs' supervisors expressly told her that they had concerns about her problems with alcohol;

(2) plaintiff was given--and passed--alcohol testing at work prior to her termination;

(3) management expressed concerns less than a week from plaintiff's termination regarding a "bad" weekend due to alcohol problems;

(4) a week before her termination, plaintiff was approached by Fahey to determine whether she smelled of alcohol based on Galasso's concerns (Fahey concluded that she did not smell alcohol on plaintiff or perceive any impairment);

(5) plaintiff was told at her termination meeting that management knew she has a problem with alcohol;

(6) plaintiff was told at her termination meeting that she would not have been terminated if she elected to enter a treatment program for her alcoholism; and

(7) management memorialized that the termination meeting was more like an intervention than a termination.

Plaintiff claims that this evidence demonstrates that defendant discriminated against her because of her perceived or actual disability--alcoholism--in violation of the New Jersey Law Against Discrimination.[2]  Defendant has moved for summary judgment in its favor, arguing that plaintiff has failed to support her claim.  Plaintiff has opposed defendant's motion.

## DISCUSSION

### I. Jurisdiction

When defendant removed plaintiff's complaint to this Court, the complaint contained both federal and state claims.  As a result, this Court had jurisdiction over plaintiff's federal claims under 28 U.S.C. § 1331, and supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. § 1367(a), which provides in relevant part, "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original

---

[2]In her complaint, plaintiff also asserted claims for violations of her rights under the Family Medical Leave Act. After defendant filed its motion for summary judgment, plaintiff informed the Court via letter that she withdrew her claims under the FMLA "with prejudice."  (See Docket No. 12.)  Because plaintiff has not opposed defendant's motion as to her FMLA claims, and no stipulation between the parties dismissing the FMLA claims has been filed, judgment shall be entered in defendant's favor on those claims. See, e.g., Fed. R. Civ. P. 41 (only allowing a plaintiff to voluntarily withdraw his complaint at any time prior to the filing of an answer or a motion for summary judgment).

6

jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

As noted above, in her opposition to defendant's motion for summary judgment, plaintiff did not oppose the entry of judgment in defendant's favor on her federal claim. Even though the Court "may decline to exercise supplemental jurisdiction" when the court "has dismissed all claims over which it has original jurisdiction," 28 U.S.C. § 1367(c), the Court has chosen to continue exercising its supplemental jurisdiction to resolve the remaining state law claim. At this stage in the case, where there has been a full period of discovery and a fully briefed summary judgment motion pending, and where the state law claim is part of the same case and controversy as the now-dismissed federal claim, judicial economy, convenience and fairness to the litigants weigh in favor of maintaining supplemental jurisdiction in this case. See Kach v. Hose, 589 F.3d 626, 650 (3d Cir. 2009) (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726-27 (1966) (other citations omitted)) (explaining that the "decision to retain or decline jurisdiction over state-law claims is discretionary," but that "discretion, however, is not unbridled," and it "should be based on considerations of 'judicial economy, convenience and fairness to the litigants'"); see also Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995) ("[W]here the claim over which the district court has original jurisdiction is dismissed before trial,

7

the district court must decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.").[3]

## II. Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of

---

[3]The Federal Courts Jurisdiction and Venue Clarification Act of 2011, Pub. L. No. 112-63, 125 Stat. 758 (2011), amended 28 U.S.C. § 1441(c), and now requires that a district court remand unrelated state law matters that were removed along with federal claims. The amendment does not affect this case because it is only applicable to actions commenced after January 6, 2012. Moreover, even if it were applicable, plaintiff's state law claims form part of the same case or controversy as her federal claims, and thus remand of the state claims would not be required.

the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

**III. Analysis**

Defendant has moved for summary judgment in its favor on plaintiff's NJLAD claim, arguing that under the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) burden-shifting framework, plaintiff cannot establish a prima facie case of discrimination that she was terminated because of her actual or perceived disability of alcoholism, and even if she could establish a prima facie case, she cannot rebut defendant's legitimate reason for her

9

termination--her poor attendance. In opposition to defendant's motion, plaintiff argues that the McDonnell Douglas burden-shifting test does not apply to her case because instead of presenting circumstantial evidence to support her discrimination claim, which would require the application of the burden-shifting framework, she has presented direct evidence of discrimination, which applies the standard set forth in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). In reply, defendant contends that plaintiff's proffered direct evidence does not qualify as direct evidence of discrimination, and it otherwise fails to demonstrate issues of material fact that require a jury to resolve.

The overarching goal of the NJLAD "is nothing less than the eradication of the cancer of discrimination." Fuchilla v. Layman, 537 A.2d 652, 660 (N.J. 1988) (citation omitted). One act prohibited under the NJLAD is discrimination by an employer for an employee's disability--one that is either actual or only perceived. See N.J.S.A. 10:5-4; N.J.S.A. 13:13-1.3 ("A person with a disability also means: 1. A person who is perceived as or believed to be a person with a disability, whether or not that individual is actually a person with a disability."). Alcoholism is considered a disability under the NJLAD. Clowes v. Terminix Intern., Inc., 538 A.2d 794, 804 (N.J. 1988).

When an employee, like plaintiff here, feels that she has been terminated because of her disability, she may prove her case in

10

three ways.  Typically, because "discrimination is not usually practiced openly and intent must be found by examining what was done and said in circumstances of the entire transaction," an employee may prove an employer's discriminatory intent through circumstantial evidence.  Bergen Commercial Bank v. Sisler, 723 A.2d 944, 953 (N.J. 1999) (citing Parker v. Dornbierer, 356 A.2d 1, 3 (N.J. Super. Ct. App. Div. 1976)).  When an employee presents circumstantial evidence to support her case, the burden-shifting methodology described by the Supreme Court in McDonnell Douglas is applied.  Id. at 954.  Under this three-stage process, if an employee proves a prima facie case of discrimination, the burden shifts to the employer to show a legitimate, non-discriminatory reason for its employment decision.  Id. at 955.  The burden then shifts back to the employee to prove by a preponderance of the evidence that the legitimate non-discriminatory reason articulated by the employer was not the true reason for the employment decision, but was merely a pretext for discrimination.  Id. (citation omitted).

　　An employee may also prove her discrimination claim through proof of direct evidence of discriminatory intent.  Direct evidence "is that which if believed, proves [the] existence of [a] fact in issue without inference or presumption."  Id. at 954 (citation omitted).  In a case for discriminatory discharge, an employee must show direct evidence that decisionmakers terminated her employment

11

because of her disability.  See Deane v. Pocono Medical Center, 142 F.3d 138, 149 (3d Cir. 1998) ("[The] call from Hann terminating Deane because of her 'handicap' is uncontroverted direct evidence that Deane suffered an adverse employment action because of her employer's perception of her disability.") (citing Martinson v. Kinney Shoe Corp., 104 F.3d 683, 686 (4th Cir. 1997) ("When an employer concededly discharges an employee because of a disability, the employee need prove nothing more to meet the third prong of the prima facie test.")).  "The evidence produced must, if true, demonstrate not only a hostility toward members of the employee's class, but also a direct causal connection between that hostility and the challenged employment decision."  Sisler, 723 A.2d at 954 (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989)) (other citations omitted).

    Where an employee has direct evidence of discrimination, but the employer has also presented evidence that it would have terminated the employee even in the absence of any discrimination, the "mixed-motive" theory applies.  Under that theory, when an employee produces evidence that an employer placed substantial reliance on a proscribed discriminatory factor in making the adverse employment decision, the burden of persuasion shifts to the employer to prove that even if it had not considered the proscribed factor, the employment action would have occurred.  Dorfman v. Pine Hill Board of Educ., 346 Fed. Appx. 825, 829 (3d Cir. 2009) (citing

McDevitt v. Bill Good Builders, Inc., 816 A.2d 164, 168 (N.J. 2003)).[4]

Here, plaintiff contends that her seven pieces of evidence, if believed by a jury, show that defendant terminated her because she is--or they perceived her to be--an alcoholic. Most compelling, plaintiff argues, is the fact that Galasso stated in her deposition that plaintiff would not have been terminated if she attended an alcohol rehabilitation program. Specifically, when relating how plaintiff's alcoholism was discussed at her termination meeting, Galasso testified that plaintiff brought up her alcohol-related problems, and informed them that she was "trying hard." Galasso

---

[4] The Court notes that the viability of the mixed-motive analysis in age discrimination cases brought pursuant to the NJLAD recently has been called into question. See Harth v. Daler-Rowney USA Ltd., 2012 WL 893095, *3 (D.N.J. March 15, 2012) (citing Geltzer v. Virtua W. Jersey Health Sys., 804 F. Supp. 2d 241, 250 (D.N.J. 2011)) (explaining that although the standard for analyzing claims under the ADEA has changed from the mixed-motive burden shifting analysis to a but-for causation requirement where there are allegations of direct evidence, that standard has not yet been applied to NJLAD claims); O'Brien v. Telcordia Technologies, Inc., 20 A.3d 1154, 1163 (N.J. Super. Ct. App. Div. 2011) (explaining that "we defer a decision on the thorny issue of the continued viability of the use of a Price Waterhouse mixed-motive analysis in light of the United States Supreme Court's decision in Gross v. FBL Financial Services, Inc., 557 U.S. 167 (2009) in an age discrimination case instituted pursuant to the NJLAD"). Whether the mixed-motive theory will continue to be viable for disability discrimination claims is yet to be seen. See, e.g., Cottrell v. Zagami, LLC, 2012 WL 479972, *4 n.5 (D.N.J. Feb. 14, 2012) (citing Warshaw v. Concentra Health Servs., 719 F. Supp.2d 484, 502 (E.D. Pa. 2010); Cottrell v. Good Wheels, 2011 WL 900038, *6 n.5 (D.N.J. March 15, 2011) (noting that courts in this Circuit have concluded that the mixed-motive analysis does not apply to ADA discrimination claims)).

testified that they suggested that plaintiff attend the "RAMP" program, which is type of substance abuse rehabilitation program offered by defendant to its employees. Galasso stated, "We offered RAMP, because RAMP is a way that people don't get terminated. If you voluntarily go to RAMP, then you go through the program and you don't get terminated. You keep your job. And we offered her that at the time." (Pl. Ex. C, at 101:8-13.) When asked, "Ms. Skidmore had the option at that point to go to RAMP and she would not have been terminated at that point?", Ms. Galasso answered, "Yes." (Id. at 102:3-6.) Continuing, Galasso was asked, "So Ms. Skidmore was told that if she sought treatment for her alcoholism that she would not be terminated at that point?", and Galasso answered, "Absolutely." (Id. at 102:7-10.) Plaintiff argues that this statement by Galasso, by itself, and in combination with the other proffered evidence, directly demonstrates that defendant terminated her because of her disability.

Defendant challenges the "directness" of all seven of plaintiff's pieces of evidence. Defendant argues that Galasso's and Fahey's expressions of concern over plaintiff's health and emotional state, and their suggestions on what she could do to help herself, such as going to rehabilitation, were simply acts of human kindness, and they had no bearing on the sole reason for plaintiff's termination--her poor attendance record. Defendant was aware that plaintiff's tardiness and absences from work were

14

related to her personal problems, but the cause of her attendance issues, defendant argues, was irrelevant to the determination to terminate her because of her poor attendance.  Defendants argue that if an employer's concern over its employee's health and medical issues was to be held to be discriminatory, it would dehumanize their relationship for fear that its concern would land them in court.  (See Def. Reply Br. at 6, citing cases.)

Defendant's point is well-taken.  Where an employee has became distraught at the workplace, it would seem unkind, and even cruel, for a supervisor to not offer encouragement or displays of comfort and kindness.  This is particularly true in situations involving nurses in the hospital setting, where their profession requires the expression of compassion for others.

In this case, however, when applying the disimpassioned legal standard in analyzing disability discrimination claims, plaintiff has presented evidence, if believed by a jury, that demonstrates that defendant terminated plaintiff's employment because of her alcoholism.  The testimony by Galasso could be believed to mean that plaintiff would not have been fired had she entered defendant's alcohol rehabilitation program.  That testimony, when considered in the context of the totality of the circumstances surrounding plaintiff's termination, demonstrates--if believed by a jury--that the "decisionmaking process actually bore on the employment decision at issue and communicated proscribed animus."

15

McDevitt v. Bill Good Builders, Inc., 816 A.2d 164, 168-69 (N.J. 2003) (discussing Fakete v. Aetna, Inc., 308 F.3d 335, 337 (3d Cir. 2002), explaining the standard for analyzing a plaintiff's proffer of direct evidence, and instructing that a court consider the overall strength of the evidence under the totality of the circumstances rather than focusing exclusively on the "directness" of the proffered evidence itself).  In other words, the evidence, if believed by a jury, could show that plaintiff's alcoholism--and her failure to attend rehabilitation--was the reason she was let go.[5]

    Of course, the fact that plaintiff suffers from a disability does not prevent her employer from terminating her for other reasons, and the NJLAD allows the employer freedom to reject those employees "who are unable to do the job, whether because they are generally unqualified or because they have a handicap that in fact impedes job performance.  There should be no second-guessing the employer."  Clowes v. Terminix Intern., Inc., 538 A.2d 794, 804 (N.J. 1988) (citation omitted); Beck v. Tribert, 711 A.2d 951, 958 (N.J. Super. Ct. App. Div. 1998) (quoting Velantzas v. Colgate-Palmolive Co., Inc., 536 A.2d 237 (N.J. 1988)).  Moreover, specifically with regard to alcoholism, "[t]here are, to be sure,

---

[5]Because the direct evidence standard is the most exacting of the three avenues by which a plaintiff can prove her discriminatory discharge claim, the Court does not need to fully consider the mixed-motive or burden-shifting standards at this time.

16

situations in which the [disability] may affect the alcoholic's ability to do his or her job.  The [NJLAD] does not prohibit discrimination against the [disabled] where 'the nature and extent of the [disability] reasonably precludes the performance of the particular employment.'"  Clowes, 538 A.2d at 804 (quoting N.J.S.A. 10:5-4.1).

    These sentiments may be true to plaintiff's situation.  It is for a jury to decide, however, whether they do.  Accordingly, defendant's motion for summary judgment as to plaintiff's claims arising under the NJLAD must be denied.  An appropriate Order will be entered.

Date: June 20, 2012                                  s/ Noel L. Hillman
                                                                              NOEL L. HILLMAN, U.S.D.J.

At Camden, New Jersey